**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DOUGLAS FROHLICH, on behalf of Plaintiff and the class members defined herein, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BLACK HILLS CREDIT d/b/a CASCADE SPRINGS CREDIT; GALT FINANCIAL SOLUTIONS, LLC; and VELOCITY VENTURES GROUP, LLC d/b/a INFINITY ENTERPRISE LENDING SYSTEMS; and JOHN DOES 1-20, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT – CLASS ACTION

1.      Plaintiff brings this action to secure redress from predatory and unlawful loans made to Illinois residents (such as Exhibit A). The loans are ostensibly made by Defendant Black Hills Credit d/b/a Cascade Springs Credit ("Cascade Springs Credit").  They are in fact made by Galt Financial Solutions, LLC ("Galt") and Velocity Ventures Group, LLC d/b/a Infinity Enterprise Lending Systems ("Infinity").

2.      Plaintiff seeks a declaratory judgment that the loans are void (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III—the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964 (Count IV), and damages for unjust enrichment (Count V).

1

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 18 U.S.C. § 1964 (RICO), 28 U.S.C. §1337 (interstate commerce), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4.      On information and belief, there are more than 100 members of the class, and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendants because they:

a.      Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6.      Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Illinois.

7.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury

2

Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

8.      Plaintiff is a citizen of Illinois residing in Chicago, Illinois.

### Defendants

9.      Defendant Cascade Springs Credit claims to be owned by the Rosebud Sioux Tribe of the Rosebud Indian Reservation, a federally recognized sovereign American Indian tribe in South Dakota ("Tribe") and claims to operate via the Rosebud Economic Development Corporation ("REDCO"), which operates from 27565 Research Park Dr., Mission, SD 57555 and claims to be a wholly owned economic arm and instrumentality to the Tribe.

10.      Cascade Springs Credit issues loans to consumers online through the website www.CascadeSpringsCredit.com. (Exhibit B)

11.      Defendant Galt is a South Dakota limited liability company with a principal business address of 539 W. Commerce St., Suite 6510, Dallas, TX 75208. Its registered agent and office is Registered Agents, Inc., 25 1st Ave. SW, Suite A, Watertown, SD 57201-3507.

12.      Defendant Infinity is a limited liability company organized under Nevada law with a principal business address of 4864 Sparks Blvd., Sparks, NV 89436. Its registered agent and office is Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, NV 89123.

13.      John Does 1-20 are other natural or artificial persons who participated in the acts complained of.

3

## FACTS

## LOAN TO PLAINTIFF

14.     On October 11, 2023, Cascade Springs Credit made a loan to Plaintiff (Exhibit A) with an amount financed of $500 and a disclosed annual percentage rate of 676.51%. The loan was made via the website www.CascadeSpringsCredit.com.

15.      Cascade Springs Credit transferred the proceeds of the loan through the ACH network into Plaintiff's bank account in Illinois.

16.     The loan was to be repaid via ACH debits from Plaintiff's bank account in Illinois.

17.     Plaintiff made some payments.

18.     The loan is not fully paid.

19.     Cascade Springs Credit has repeatedly texted and emailed Plaintiff seeking payment. (Exhibit C)

20.     Plaintiff  has never set foot on tribal land or visited Mission, South Dakota.

21.     Plaintiff took the loan out from Illinois via the Internet, had the proceeds sent electronically to an Illinois bank account, signed all loan documents in Illinois, received loan communications in Illinois, and had payment debited from Plaintiff's account at an Illinois bank.

## DEFENDANTS' OPERATIONS

22.     Cascade Springs Credit is purportedly owned by the Tribe.

23.     In fact, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

24.     In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

25.     All essential business operations of Cascade Springs Credit are performed in locations outside of the Tribe's jurisdiction, including Texas and Florida.

26.     The web server used to make the transactions is located in a data center an hour and a half southeast of Los Angeles.

4

27.     These off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

28.     These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance, and marketing.

29.     While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

30.      Supposedly, Cascade Springs Credit Financial operates under a lending license granted by the Tribe, beholden only to Tribe's own "Financial Services Regulatory Authority," which, of course, permits lending at 700% interest rates.

31.     The Tribe ostensibly operates over a dozen different online lending websites—all of which make small-dollar, short-term loans at interest rates exceeding 500%.

32.     Cascade Springs Credit is beneficially owned and operated by Galt (and its investors) and receives the overwhelming percentage of profits generated.

33.     Galt previously ran an online lending platform called Lend You Cash (LendYouCash.com), which made loans to consumers in a handful of states and operates from the IP address http://192.124.249.75/.

34.     Galt operates a lending platform called Galt Credit (GaltCredit.com) which makes loans to consumers in Texas, Missouri, Wisconsin, and Utah, via its Texas Credit Access Business ("CAB") license number 2200071668-169753.

35.     The IP address for GaltCredit.com is http://192.124.249.12/, meaning the server hosting it is contained in the same physical data center and the servers are located physically near each other.

36.     The IP address for CascadeSpringsCredit.com is http://192.124.249.6/, meaning that it is in the exact same data center as GaltCredit.com and LendYouCash.com.

5

37. The odds that any three websites would, at random, have the same first three digits of an IP address are less than 1 in a billion.

38. Calling the customer service number for Galt Credit, 800-402-8845, results in a female automated voice stating: "Thank you for calling Galt Credit, formerly known as Lend You Cash. This call may be monitored for quality and training purposes. Please select one of the following options. For new loans, press 1. For the VIP line, press 2. Collections, press 3. Payments, press 4. General questions, press 5. If you know the agent's extension, please dial it at any time. We appreciate your call."

39. Calling the customer service number for Cascade Springs Credit, 800-264-9847, results in the identical female automated voice stating: "Thank you for calling Cascade Springs Credit. This call may be monitored for quality and training purposes. Please select one of the following options. For new loans, press 1. For the VIP line, press 2. Collections, press 3. Payments, press 4. General questions, press 5. If you know the agent's extension, please dial it at any time. We appreciate your call."

40. Infinity is a "back-end" services vendor that provides software to analyze, underwrite, service, and collect high-interest Internet loans.

41. Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending."

42. Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans."

43. Infinity's website, [InfinitySoftware.com](InfinitySoftware.com), as well as [paydayloanmanager.com](paydayloanmanager.com), are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156.

6

44. More than 100 different payday lending websites are hosted by Infinity on the same server, many of which claim sham "tribal" affiliations.

45. Infinity's website even features testimonials from non-tribal individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

46. One such testimonial is from Dustin A. Dernier ("Dernier"), who is identified as "CEO 605 Lending."

47. Dernier states, "[t]he Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us every step of the way."

48. Another testimonial is from John Humphrey ("Humphrey"), identified as "COO DMP Investments."

49. DMP Investments LLC is owned by the Texas payday loan magnate William C. Pruett ("Pruett"), who operates numerous payday lending businesses, including several operated under a "rent-a-tribe" model, including Sky Trail Cash, supposedly owned by the Lac du Flambeau tribe in rural Wisconsin. It makes loans to consumers in many states, including Florida, at interest rates exceeding 700% annually.

50. Humphrey lavishes praise on Infinity, stating, "[y]our software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at Infinity Software and consider their software platform an indispensable resource in operational landscape."

51. Infinity's website features a video touting how its software features "end-to-end loan process automation" and can "automate the loan collection process for maximum results."

52. Infinity received a portion of the profits made off the interest rates charged to Plaintiff.

53. Infinity knew that its software was facilitating unlawful loans.

54. Infinity provided technology to Cascade Springs Credit specifically designed to

7

facilitate illegal loans.

55.     Thus, Galt and Infinity, and not the Tribe, are the true lenders of the loans made to Plaintiff, because they have the predominant economic interest in the loans made to consumers via www.CascadeSpringsCredit.com.

56.     Since nearly all meaningful activity concerning the loans does not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Tribe's land, the loans were not made "on" the reservation.

57.     A significant majority of the transactions occur within Illinois—from completing the application to receiving the funds.

58.     The location of the consumer determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

## RENT A TRIBE SCHEME AND INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

59.     In an attempt to evade prosecution under usury laws of states like Illinois, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

60.     The illegal loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

61.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies

from scheme-to-scheme, the number is almost always in the single digits.

62.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

63.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

64.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

65.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

66.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

67.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in

the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy

Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See*

*United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in

*United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

68.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it

unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates

in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and

void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any

principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

69.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the

commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and

Deceptive Business Practices Act."

70.     Both before and after March 23, 2021, it was unlawful for anyone who did not have

a bank or credit union charter or a consumer lending license issued by the Illinois Department of

Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15,

4-5; 205 ILCS 670/1.

71.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons

are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this

Section, if any person who does not have a license issued under this [Consumer Installment Loan]

Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void

and the person who made the loan shall have no right to collect, receive, or retain any principal,

interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other

provision of this Section, if a lender who does not have a license issued under this [Payday Loan

Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null

and void and the lender who made the loan shall have no right to collect, receive, or retain any

principal, interest, or charges related to the loan.").

72.     Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

73.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

74.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

75.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *See, e,g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569); *In the Matter of Money Mutual, LLC,* No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

76.     The excessive interest charges imposed by Defendants were willful.

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

77.     Plaintiff incorporates paragraphs 1-76.

78.     This claim is against all Defendants.

79.     There is a controversy between Plaintiff, on the one hand, and Defendants, on the other, as to whether Plaintiff must repay the loans made to them.

80.     Declaratory relief will resolve such controversy.

81.     An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

82.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

83.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Cascade Springs Credit (c) at more than 9% interest (d) which loan is still outstanding.

84.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

85.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

86.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

87.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

12

88.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

89.     A class action is superior for the fair and efficient adjudication of this matter, in that:

a.      Individual actions are not economically feasible.

b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.      Declaratory and injunctive relief;

ii.     Restitution of all amounts collected;

iii.    Costs of suit; and

iv.     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

90.     Plaintiff incorporates paragraphs 1-76.

91.     This claim is against all Defendants.

92.     Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

93.     Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

94.     Plaintiff bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

95.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Cascade Springs Credit (c) at more than 9% interest (d) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

96.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

97. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

98. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

99. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

100. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

101. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Damages as provided in 815 ILCS 205/6;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other and further relief as the Court deems proper.

## COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

102. Plaintiff incorporates paragraphs 1-76.

103. This claim is against all Defendants.

104. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

105. Violation of the Predatory Loan Prevention Act is a violation of the Illinois

14

Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

106.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

107.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Cascade Springs Credit (c) at more than 36% interest (d) on or after March 23, 2021.

108.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

109.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

110.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

111.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained  counsel experienced in class actions and consumer credit litigation.

112.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

113.     A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.     Compensatory damages;

15

ii.     Punitive damages;

iii.    Attorney's fees, litigation expenses and costs of suit; and

iv.     Such other and further relief as the Court deems proper.

## COUNT IV – RICO

114.    Plaintiff incorporate paragraphs 1-76.

115.    This claim is against Galt, Infinity, and John Does 1-20, who are the RICO "persons."

116.    All loans made in the name of Cascade Springs Credit to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

117.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

118.    Cascade Springs Credit is an enterprise affecting interstate commerce, in that it purports to be located in South Dakota and make loans to Illinois and other U.S. residents via the Internet.

119.    Defendants Galt, Infinity, and John Does 1-20 are associated with the enterprise.

120.    Defendants Galt, Infinity, and John Does 1-20 conducted or participated in the conduct of the affairs of this enterprise through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

121.    Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

122.    Plaintiff brings this claim on behalf of a class.

123.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Cascade Springs Credit at more than 18% interest (all such loans qualify) (c) which loan was made on or after a date four years prior to the filing of suit.

124.    The class is so numerous that joinder of all members is not practicable. On

16

information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

125.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.     Whether Cascade Springs Credit is an "enterprise."

      c.     Whether Defendants Galt, Infinity, and John Does 1-20 are associated with the enterprise.

      d.     Whether Defendants Galt, Infinity, and John Does 1-20 conducted or participated in the affairs of the enterprise through a pattern of making and collecting unlawful loans.

126.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

127.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

128.     A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants Galt, Infinity, and John Does 1-20 for:

      i.     Treble damages;

      ii.     Attorney's fees, litigation expenses and costs of suit; and

      iii.     Such other or further relief as the Court deems proper.

## COUNT V – UNJUST ENRICHMENT

129.     Plaintiff  incorporates paragraphs 1-76.

130.     This claim is against all Defendants.

131.     Defendants obtained money from Plaintiff and the class members through unjust means, and should in equity be required to disgorge such money.

## CLASS ALLEGATIONS

132.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

133.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Cascade Springs Credit  (c) at more than 36% interest (d) on or after March 23, 2021.

134.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

135.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

136.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

137.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

138.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

139.     A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.     Individual actions are not economically feasible.

          b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

          i.      Appropriate damages;

          ii.      Costs of suit; and

          iii.      Such other and further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark
Caileen M. Crecco
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
dedelman@edcombs.com
jclark@edcombs.com
ccrecco@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


<u>*/s/ Daniel A. Edelman*</u>
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, the events described herein, any third party associated with any loan, telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or loan or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.


*/s/ Daniel A. Edelman*
Daniel A. Edelman